**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| OLIN LESLIE CLICK III D/B/A CLICK FARMS, on their own behalf and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br>v.<br><br>NUTRIEN LTD; NUTRIEN AG SOLUTIONS; CF INDUSTRIES HOLDINGS, INC.; KOCH, INC. f/k/a KOCH INDUSTRIES, LLC; KOCH FERTILIZER WEVER, LLC; KOCH AGRONOMIC SERVICES, LLC; YARA INTERNATIONAL ASA; THE MOSAIC CO.; AND CANPOTEX LTD.,<br><br>*Defendants*. | Case No.<br><br>**Jury Trial Demanded**<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Olin Leslie Click III d/b/a Click Farms ("Click Farms" or "Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), files this Complaint against defendants CF Industries Holdings, Inc., CF Industries Inc., and CF Industries Nitrogen, LLC (together, "CF Industries"); Koch, Inc. f/k/a Koch Industries, Koch Fertilizer Wever, LLC, Koch Fertilizer, LLC and Koch Agronomic Services, LLC (together, "Koch"); Yara International ASA and Yara North America, Inc. (together, "Yara"); Nutrien Ltd. and Nutrien Ag Solutions, Inc. (together, "Nutrien"); The Mosaic Company ("Mosaic"); and Canpotex Ltd. ("Canpotex").

Plaintiff advances its class wide claims based on personal knowledge regarding facts specific to itself, and upon information and belief for all other matters, relying on counsel's investigation. This action seeks damages, injunctive relief, and additional remedies in accordance with Section 1 of the Sherman Act, as well as federal antitrust violations and common law claims. The Plaintiff demands a jury trial for all issues where such entitlement exists.

## I. NATURE OF THE ACTION

1. This action arises from the Defendants' alleged conspiracy to fix, raise, maintain, or stabilize prices for nitrogen, phosphate, and potassium (potash) fertilizers ("NPK Fertilizers") beginning on or about January 1, 2021, and continuing until such unlawful conduct and its anticompetitive effects are resolved (the "Class Period").

2. This action stems from an alleged conspiracy among Defendants to fix, increase, maintain, or artificially sustain prices for:

a. Nitrogen Fertilizers ("Nitrogen Fertilizers") produced by CF Industries, Koch, Nutrien, and Yara. (collectively, the "Nitrogen Defendants");

b. Phosphorus Fertilizers ("Phosphorus Fertilizers") produced by Mosaic and Nutrien (the "Phosphorus Defendants"); and

c. Potassium Fertilizers ("Potash Fertilizers") produced by Mosaic, Nutrien, and Canpotex (the "Potash Defendants"). All these products are collectively referred to as "NPK Fertilizers."

3. The conduct in question began during or before January 1, 2021, and will continue until this Court orders the Defendants to stop their secreted unfair, deceptive, wrongful, and unlawful acts and practices and thus begins the end of the slow process of mitigating and eliminating the related anticompetitive effects (the "Class Period").

4. Plaintiff, individually and on behalf of all others similarly situated, seeks both monetary and injunctive relief arising from Defendants' unlawful and ongoing agreement to fix the prices for nitrogen, phosphate and potassium (potash) fertilizers (individual and collectively, "NPK Fertilizers") sold and purchased throughout the United States and its territories, from January 1, 2020 to the present day.

5. The Defendants are direct competitors and among the largest producers and sellers of NPK Fertilizers in the United States.

6. Among the victims of the conspiracy are purchasers of NPK Fertilizers from the Defendants, including agricultural retailers, fertilizer mixers, members of farming associations, farm, planting partnerships/companies, golf courses and other assorted individual farmers and growers.

7. In furtherance of their alleged price-fixing scheme, Defendants commenced efforts to artificially increase the price of NPK Fertilizers beginning on or about January 1, 2021, although the Plaintiff is presently unable to ascertain the exact start date.

8. Defendants' alleged agreement resulted in purchasers of NPK Fertilizers within the United States and its territories, including Plaintiff and the Class members, paying inflated and supra-competitive prices for NPK Fertilizers sold by Defendants from no later than January 1, 2021 through the date of class certification (the "Class Period"), in contravention of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

9. The Plaintiff initiates this action on behalf of all purchasers of NPK Fertilizers in the United States, seeking remedies for injuries resulting from Defendants' alleged conspiracy and misconduct. The claims assert violations of Section 1 of the Sherman Antitrust Act of 1890 ("Sherman Act"), 15 U.S.C. §1, as well as breaches of relevant state antitrust statutes. In addition to damages, the Plaintiff requests injunctive relief, disgorgement of unlawful profits, and reimbursement of all expenses associated with this litigation, including reasonable attorneys' fees. Due to Defendants' concerted efforts to fix, raise, maintain, or manipulate prices and supply of NPK Fertilizers, the Plaintiff and similarly situated Class members have incurred substantial harm.

## II. JURISDICTION AND VENUE

10. The Plaintiff has filed this class action pursuant to Sections 4 and 16 of the Clayton

Act (15 U.S.C. §§ 15 and 26), seeking recovery for damages sustained by the Class, as well as litigation costs and reasonable attorneys' fees. The Plaintiff further requests injunctive relief to address Defendants' alleged anticompetitive practices and seeks all additional remedies available under United States antitrust law for violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

11. The subject matter jurisdiction of this Court is found in 28 U.S.C. §§ 1331, 1337, as well as Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

12. Venue is appropriate in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), as well as 28 U.S.C. § 1391(b), (c), and (d). At all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District

13. This Court has personal jurisdiction over each Defendant, as each has conducted business, established substantial contacts, or engaged in overt acts within the United States, including this District and the state of Illinois, in furtherance of the alleged unlawful scheme and conspiracy. The purported scheme and conspiracy were intentionally directed toward, and resulted in harm to, individuals and entities residing, located, or conducting business throughout the United States, including within this District and the state of Illinois.

14. Defendants are subject to service of process pursuant to Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute, 735 ILCS 5/2-209, as each Defendant has conducted business within the state. The Illinois long-arm statute extends jurisdiction to the full extent permitted by Due Process, and each Defendant possesses sufficient minimum contacts with Illinois to meet the requirements of Due Process.

15. This Court also has original jurisdiction over this lawsuit pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6), because Plaintiff is a citizen of a

state different from that of one or more of the Defendants; the Class has more than 100 members; the aggregate amount in controversy exceeds five million dollars, exclusive of attorney's fees, interest and costs; and Class Members reside across the United States.

16. This Court has personal jurisdiction over the Defendants based on Fed. R. Civ. P. 4(d) and Section 12 of the Clayton Act (15 U.S.C. § 22), which authorizes nationwide service of process and confers personal jurisdiction over a defendant who has sufficient minimum contacts with the United States as a whole. When Congress has enacted such a nationwide service of process statute, personal jurisdiction exists whenever the defendant has sufficient minimum contacts with the United States to satisfy the Fifth Amendment's due process requirements. Exercising personal jurisdiction over a defendant is proper under the Fifth Amendment Due Process Clause when, as here, the defendant and the conduct at issue bear a meaningful relationship to the United States. Defendants have a meaningful relationship with the United States through their or their subsidiaries' operation in the country and their sale of NPK Fertilizers throughout the United States. The United States and its courts, including this Court, have a clear interest in adjudicating anticompetitive conduct occurring in the United States that affects United States commerce and United States businesses and consumers. Defendants are sophisticated and substantial organizations with United States facilities or subsidiaries and have operations in this country, making it fair for them to litigate in this District.

17. Alternatively, the Court has personal jurisdiction over Defendants because they purposefully directed their business activity toward this jurisdiction and had substantial contacts with this jurisdiction. Defendants purposefully placed price-fixed NPK Fertilizer into the stream of commerce throughout the United States, including in this District. Defendants purposefully availed themselves of the laws and protections of this state. Plaintiff's claim for relief arises from and relates to illegal acts committed by Defendants within this jurisdiction because Defendants

imposed unlawful overcharges for NPK Fertilizers and caused antitrust injury within this jurisdiction. Defendants' antitrust conspiracy was and is directed at, and had and has the intended effect of causing injury to, persons residing in, located in, or doing business in the United States, including in this District. Defendants sell their products in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

18. Venue is proper in this District under 28 U.S.C. § 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22. During the Class Period Defendants transacted business in this District, and a substantial portion of the activity at issue in this case occurred in this District. For example, CF Industries Holdings, Inc. operates its corporate headquarters in this District.

19. Defendants' conduct alleged herein occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce.

20. During the Class Period, Defendants produced and sold NPK Fertilizers in a continuous and uninterrupted flow of interstate commerce, which included manufacturing and selling NPK Fertilizers in this District and employing sales and other personnel in this District. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this District.

## III. TOLLING OF THE STATUTE OF LIMITATIONS

21. The Defendants fraudulently concealed their actions. Thus, the statute of limitations is tolled as to all rights and claims related to their alleged conspiracy described in this complaint.

22. During the Class Period, Defendants consistently sold NPK Fertilizers at fixed prices due to their ongoing price-fixing activities and industry data-exchange agreements.

23. Each instance of a continuing violation restarts the statute of limitations period upon the commission of an overt act by the Defendants.

24. In the context of a price-fixing conspiracy, every sale made at an inflated price initiates a new statute of limitations period, irrespective of the plaintiff's prior awareness of its illegality. Consequently, each instance in which a defendant sells NPK Fertilizer at an unlawful price constitutes a separate cause of action with respect to the statute of limitations.

25. These actions were not merely reiterations of the prior unlawful and anticompetitive conduct, but constituted new, deliberate, and independent steps that maintained Defendants' agreement and allowed it to adjust to evolving market conditions.

26. Through the ongoing modification and enhancement of their agreement in response to market developments, Defendants inflicted additional and cumulative harm upon Plaintiff and the Class members further tolling the statute of limitations.

## IV. PARTIES

### A. Plaintiff

27. Plaintiff Olin Leslie Click III d/b/a Click Farms is a family farm with its principal place of business at 1600 Ball Park Road, Union Grove, AL 35175.

28. During the Class Period, Plaintiff purchased NPK Fertilizers in the United States or its territories at supra-competitive prices from one or more of the Defendants.

### B. Defendants

**CF Industries**

29. CF Industries Holdings, Inc. is a publicly traded company listed on the New York Stock Exchange (NYSE: CF) and is headquartered at 2375 Waterview Drive, Northbrook, Illinois 60062. It produces nitrogen-based NPK Fertilizers for sale throughout the United States and the United Kingdom.23

30. CF Industries Inc. is a wholly owned subsidiary of CF Industries Holdings, Inc. and

was incorporated in Delaware, with its principal place of business also located in Northbrook, Illinois. CF Industries Inc. serves as the primary operating subsidiary of CF Industries Holdings, Inc.

31. CF Industries Nitrogen, LLC, is an agricultural cooperative of which CF Industries Inc. owns approximately 89% and CHS Inc. owns the remaining 11%. CF Industries Nitrogen, LLC is a Delaware corporation with its principal place of business in Northbrook, Illinois.

**Koch**

32. Koch Inc. is a Kansas corporation with its headquarters in Wichita, Kansas. On August 29, 2024, Koch Industries, LLC, announced it would thereafter go by the name of Koch, Inc., consistent with the Kansas Secretary of State's website records indicating a merger and "conversion" in July 2024. Therefore, Koch, Inc., is the surviving entity and successor of its merger with Koch Industries, LLC.

33. Koch Ag & Energy Solutions, LLC, is a Delaware limited liability company with its principal executive offices in Wichita, Kansas. Koch Ag & Energy Solutions, LLC, is an indirect wholly owned subsidiary of Koch Industries, Inc. Koch Ag & Energy Solutions, LLC offers fertilizer, agronomic, and other services to its customers. A 2024 press release from this entity indicated it had invested $2 billion in North American fertilizer production facilities, and was spending another $3.6 billion to acquire its new plant in Wever, Iowa.

34. Koch Fertilizer Wever, LLC, is a Delaware limited liability company with its principal executive office in Wichita, Kansas. On August 29, 2024, Koch Ag & Energy Solutions announced it acquired the Wever, Iowa fertilizer plant from OCI Global for $3.6 billion. Therefore, Koch Fertilizer Wever, LLC is a wholly-owned subsidiary of Koch Ag & Energy Solutions, LLC.

35. Koch Agronomic Services, LLC ("KAS") is a subsidiary of Koch Ag & Energy

Solutions, LLC and Koch Industries. KAS is a leading manufacturer of nitrogen-based NPK.

36. Koch Fertilizer, LLC ("Koch Fertilizer") is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC, which is also a wholly owned subsidiary of Koch Industries. Koch Fertilizer headquarters are located at 4111 East 37th Street North, Wichita, Kansas 67220.

37. Koch Fertilizer and its affiliates are major global producers and marketers of fertilizers, including ammonia, urea, urea-ammonium nitrate ("UAN"), phosphate, potash, and sulfur-based products, producing over 12 million metric tons of fertilizer annually.

**Nutrien**

38. Nutrien Ag Solutions serves as the global retail division and wholly owned subsidiary of Nutrien Ltd., headquartered at 3005 Rocky Mountain Avenue, Loveland, Colorado 80538. As one of the largest manufacturers and distributors of nitrogen, phosphate, and related products, Nutrien Ag Solutions provides comprehensive solutions for agricultural input requirements.

39. Defendant Nutrien Ag Solutions is a Delaware corporation with its principal executive offices in Loveland, Colorado, and it is a wholly owned subsidiary of Nutrien Ltd. Alternately or in addition, Nutrien Ag Solutions is Nutrien Ltd's global retail division. Nutrien Ag Solutions' LinkedIn page describes itself as "[o]perated by Nutrien Retail, Nutrien Ag Solutions is a unit of Nutrien Ltd., the world's largest agricultural inputs company." On Nutrien Ag Solution's LinkedIn page, the company claims to have over 10,000 employees.

40. Nutrien Ltd., headquartered in Saskatoon, was created from PotashCorp (established 1975, privatized 1990) after it acquired major U.S. fertilizer companies and merged with Agrium in 2018. As a result, Nutrien became the leading global potash producer and the second-largest fertilizer company, operating six of Saskatchewan's ten potash mines and holding about 60% of North America's potash capacity.

41. Throughout the Class Period, Nutrien sold nitrogen fertilizers, phosphorus fertilizers, and potash to U.S. customers, including class members.

**Yara**

42. Yara International ASA, listed on the Oslo Stock Exchange (YAR.OL) and headquartered at Drammensveien 131, 0277 Oslo, Norway, is a global leader in the production of various nitrogen-based NPK fertilizers.

43. Yara North America, Inc., a wholly owned subsidiary of Yara International ASA, is headquartered at 100 North Tampa Street, Suite 3800, Tampa, Florida 33602. The company specializes in sales, marketing, and distribution, offering an extensive portfolio of crop nutrition solutions, including nitrogen-based and NPK fertilizers.

**Mosaic**

44. The Mosaic Company is the world's largest integrated producer of concentrated phosphate and potash nutrients for NPK fertilizers.

45. Mosaic, incorporated in Delaware and headquartered in Florida, became a global fertilizer leader after merging IMC Global and Cargill Inc.'s crop nutrition division in 2004. It expanded by acquiring Vale S.A.'s Vale Fertilizantes business in 2016, adding potash facilities in Brazil and Saskatchewan. Mosaic is publicly traded on the NYSE (MOS) and continues to lead North America's phosphate and potash production.

**Canpotex**

46. Canpotex Ltd. is a private export company jointly owned by Nutrien Ltd. and Mosaic Canada Corp Nutrition LP, a subsidiary of Mosaic. Its main office is located at Suite 700, 409 – Third Avenue South, Saskatoon, Saskatchewan, Canada S7K 5R5. Canpotex is recognized as the leading global producer of potash minerals for NPK fertilizers, and controls approximately 85% of the United States potash market share.

47. Canpotex Limited is a private joint venture owned by Nutrien Ltd. and Mosaic Canada Corp. Nutrition, LP (a wholly-owned subsidiary of Mosaic). Canpotex Limited maintains its principal executive offices in Saskatoon, Saskatchewan, Canada. In a 2020 letter to the United States Securities and Exchange Commission, Mosaic's Controller Lydia A. Burke explained that Canpotex Limited is a Saskatchewan export association owned by Mosaic and Nutrien. Each owner's relative economic interest in the joint venture "dictates the relative volumes of potash product" they sell to Canpotex. These ownership interests can be adjusted as the owners "add peaking capacities."

48. Canpotex's board of directors includes representatives of both Mosaic and Nutrien. Mosaic has explained that it does not consolidate Canpotex's accounting with its own accounting, but rather records its equity investment "using the equity method of accounting." Canpotex ships potash into the United States by rail and operates shipping terminals in Portland, Oregon and Thunder Bay, Ontario. This Complaint refers to Canpotex Limited as "**Canpotex**."

49. In a previous price-fixing case, the Seventh Circuit Court of Appeals noted the plaintiffs' claim that Canpotex facilitated that price-fixing arrangement by providing Mosaic, Agrium, and PCS with "access to one another's sensitive production and pricing information." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 850 (7th Cir. 2012) (*en banc*), *cert. dismissed*, 570 U.S. 935 (2013).

**Agents and Co-Conspirators**

50. The Defendants' anticompetitive and unlawful acts alleged in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives while they actively engaged in the management, direction, or control of Defendants' businesses or affairs. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

51. Each corporate Defendant's agents operated under the authority and apparent authority of its respective principals.

52. Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

53. Various persons and/or firms not named as Defendants herein participated as co-conspirators in the violations alleged herein and likely performed acts and made statements in furtherance thereof.

54. Each Defendant acted as the principal or agent of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

55. When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Defendants' conspiracy involved Defendants' reliance that other corporate families would act consistently with their agents' statements about prices and production. Because Defendants operate and market themselves as corporate families, individual participants in the conspiratorial acts did not often know or identify the corporate affiliations of themselves or their counterparts, nor did they recognize the technical distinction between the entities within a corporate family. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to raise and maintain supra-competitive prices of NPK Fertilizers.

## V. FACTUAL ALLEGATIONS

### A. NPK Fertilizers

56. The production and distribution of NPK Fertilizers are highly concentrated and capital-intensive, keeping barriers to entry high. Likewise, farmers cannot economically substitute

away from NPK Fertilizers or reduce use of NPK Fertilizers, maintaining inelastic demand.

57. The U.S. fertilizer market was valued at nearly $30 billion in 2025 and is expected to exceed $31 billion by 2026. Fertilizers represent a large portion of farmers' cost of production.

58. Demand remains highest for bulk NPK fertilizers.

59. Farmers cannot economically substitute away from NPK Fertilizers or reduce use of NPK Fertilizers, maintaining inelastic demand. *See, e.g*. Angelica Williams, LaPorchia A. Collins & Amy Boline, *Drivers of Fertilizer Markets: Supply, Demand, and Prices,* ERR-354, USDA Econ. Res. Serv. (Sep. 2025), https://ers.usda.gov/sites/default/files/_laserfiche/publications/113324/ERR-354.pdf?v=38488.

60. Fertilizer is vital for U.S. crop production. Modern agriculture relies on NPK fertilizers—nitrogen, phosphorus, and potassium—which support plant growth and yield. Each nutrient serves a unique role, has distinct manufacturing processes, and all are essential for crops.

61. These nutrients are supplied to crops through what farmers commonly call nitrogen, phosphate, and potash fertilizers—individually and in combination referred to as NPK Fertilizers (named after the chemical symbols for the nutrients they contain). Together they form the basis of most fertilizer programs around the world. Each plays a different role in plant growth, and each requires different raw inputs and is produced through distinct chemical and industrial processes.

62. NPK fertilizers may be administered as individual nutrient formulations or as blended and compound products containing two or three nutrients in defined proportions. Fertilizer blend labels typically specify the percentage of each nutrient present. Product selection is based on soil characteristics and crop nutritional needs.

**B. Nitrogen Fertilizers**

63. Nitrogen fertilizers are extensively utilized in agriculture, as nitrogen represents the nutrient most essential for optimal plant growth.

64. Nitrogen fertilizers are chiefly composed of nitrogen, encompassing variants such as nitrate, ammonium, ammonium nitrate, and urea. The specific form of nitrogen fertilizer is determined by the type of nitrogen compound present.

65. The manufacture of nitrogen fertilizers begins with ammonia, produced via the Haber-Bosch process. This method synthesizes anhydrous ammonia by reacting hydrogen sourced from natural gas with nitrogen obtained through air separation, under elevated temperatures and pressures using an iron-based catalyst.

66. Ammonia serves as the primary raw material for most nitrogen fertilizers. Notable types include anhydrous ammonia, urea, ammonium nitrate, and UAN solution.

67. Sufficient nitrogen supply facilitates robust leaf and stem development, contributing to accelerated vegetative growth and increased crop productivity.

68. Nitrogen constitutes an essential element of chlorophyll, the molecule responsible for facilitating photosynthesis, and is likewise critical for synthesizing proteins and additional biological compounds integral to plant development.

69. Adequate nitrogen supports the development of leaves and stems and is associated with faster vegetative growth and higher crop yield.

70. Common nitrogen fertilizers include Urea, Ammonium nitrate, Ammonium sulfate, and Urea ammonium nitrate solution. These fertilizers differ in nitrogen concentration and chemical form, yet all deliver nitrogen that plants utilize as either nitrate or ammonium ions. Typically, these products are marketed as small, spherical granules referred to as “prills.”

71. Most nitrogen fertilizers are produced through industrial ammonia synthesis via the Haber–Bosch process. This method involves combining atmospheric nitrogen with hydrogen—most often sourced from natural gas—under elevated temperature and pressure using a catalyst to generate ammonia.

72. Ammonia acts as the primary intermediate for the production of various nitrogen-based fertilizer products.

73. Anhydrous ammonia, which is 82% nitrogen, quickly becomes a gas when injected into soil. Urea is made by reacting ammonia with carbon dioxide to form ammonium carbamate, then dehydrating it. Ammonium nitrate results from combining ammonia and nitric acid. UAN is a liquid fertilizer with 28-32% nitrogen, created by mixing urea and ammonium nitrate.

74. As a result of prolonged and significant consolidation within the NPK Fertilizers industry, as detailed below, nitrogen fertilizer production remains highly concentrated. During the Class Period, CF Industries, Nutrien, Koch, and Yara collectively controlled over 80% of nitrogen fertilizer production in the United States.

**C. Phosphate Fertilizers**

75. The United States possesses an estimated one (1) billion metric tons of phosphate rock reserves, with most deposits located in Florida and North Carolina.

76. Phosphate fertilizers are produced from mined phosphate rock treated with sulfuric acid to create phosphoric acid, which is then concentrated or mixed with ammonia for use in agriculture.

77. Following extraction, phosphate rock is treated with acid—most commonly sulfuric acid—to produce phosphoric acid. This acid is then concentrated or combined with ammonia to produce phosphorus fertilizers.

78. Phosphate fertilizers supply phosphorus, an essential nutrient required for several core plant functions. Phosphorus plays an important role in energy transfer within plant cells, including through molecules such as ATP, and contributes to early plant development, root formation, and the production of flowers and seeds. Adequate phosphorus availability is therefore associated with strong root systems and successful crop establishment.

79. Diammonium phosphate, Monoammonium phosphate, and Triple superphosphate are common dry granular fertilizers, easily transported and applied directly or blended with other nutrients.

80. The extraction of phosphate rock is characterized by significant entry barriers, as it demands substantial capital investment, advanced engineering expertise, extensive permitting processes, and prolonged developmental periods prior to the commencement of production.

81. The production of phosphorus fertilizers is significantly concentrated. Throughout the Class Period, Nutrien and Mosaic collectively represented over 90% of phosphorus fertilizer manufacturing in North America.

**D. Potassium (Potash) Fertilizers*:***

82. Potassium or Potash fertilizers deliver potassium, an essential macronutrient necessary for optimal crop development.

83. Potassium plays a crucial role in maintaining water balance within plant tissues, activating key metabolic enzymes, and enhancing plant resistance to environmental stresses such as drought or disease.

84. Ensuring sufficient potassium availability can lead to improved crop quality and increased resilience.

85. Potash fertilizers are produced from naturally occurring potash ores formed from ancient, evaporated seas. More specifically, "Potash," is sourced from subterranean deposits and predominantly distributed as potassium chloride (KCl), also known as muriate of potash.

86. The majority of potash utilized in the United States is imported from mines located in Western Canada, where extraction occurs via conventional underground mining or solution mining techniques.

87. These mineral deposits are mined or extracted from brines and then processed to

separate potassium-bearing compounds suitable for agricultural use. The resulting products contain potassium in forms that plants can absorb as potassium ions.

88. The most widely used potash fertilizer is Potassium chloride, while Potassium sulfate is also used, particularly for crops that are sensitive to chloride. Potash fertilizers are typically sold as crystalline or granular solids that can be applied directly to fields or blended with other nutrients in compound fertilizers.

89. Canpotex, formed in 1972, manages the offshore marketing, sales, and transportation of Potash produced by Nutrien and Mosaic from their Canadian mines.

90. It operates an integrated export system with specialized railcars, port terminals, and ocean vessels to deliver Potash internationally.

91. Canpotex coordinates Potash export volumes, shipment schedules, and manages sensitive market information, providing a centralized mechanism for its owners.

92. As a joint exporter and marketer, Canpotex facilitates sharing of competitive information and collaboration between Nutrien and Mosaic on U.S. pricing and supply strategies.

93. Like the production of nitrogen and phosphorus fertilizers, potash mining involves significant barriers to entry, including substantial capital investment, specialized engineering expertise, permitting requirements, and extended development timelines prior to commencing production.

**1. The Market for NPK Fertilizers Has Been Systematically Consolidated for Unlawful Purposes**

94. The NPK fertilizer industry, which was once characterized by robust competition, has become highly concentrated, with Defendants occupying key positions within the sector.

95. Consequently, each primary nutrient segment is dominated by a single corporation: Mosaic leads the American phosphate market, CF Industries oversees the nitrogen sector, and Nutrien serves as the principal entity in the North American potash market, alongside Mosaic.

96. Since the 1980s, the number of firms active in the market has declined from 46 to 13, resulting in Defendants exercising considerable market control.

97. By 2012, four companies collectively held 75% of the nitrogen market, three entities commanded 90% of the phosphorus market, and three firms accounted for nearly 90% of Canadian potash imports.

98. As of 2024, fewer than five major producers remain in each NPK fertilizer segment, with Nutrien, Mosaic, and CF Industries comprising the majority share of the domestic NPK fertilizer market.

99. The fertilizer industry in the United States has historically been marked by extensive consolidation.

100. During the late 1970s and early 1980s, there were 56 nitrogen companies, 25 phosphate mining companies, and 15 potash companies operating in the United States and Canada.

101. Over the following decades, the nitrogen fertilizer sector underwent significant consolidation, declining from 59 to 22 production facilities, while the number of firms decreased from 46 to 13, with six companies accounting for 68% of the nitrogen fertilizer market share.

102. Similarly, the phosphorus fertilizer market consolidated, resulting in six companies controlling 88% of the market.

103. By 2000, just two companies—forming a Canadian oligopoly—held 85% of the potash market.

104. With more than 220 million acres of cropland under cultivation, American agriculture generates a consistent and substantial demand for NPK fertilizers. In 2024, the United States NPK fertilizer market was valued at nearly $30 billion.

105. NPK Fertilizers are favored over other fertilizers because they supply the three macronutrients that crops need in the largest amounts, are highly concentrated, predictable, and

fast-acting, allowing farmers to efficiently meet crop nutrient requirements.

106. Unlike organic fertilizers, NPK Fertilizers provide precise nutrient content, are easy to store and transport, release nutrients more quickly into the soil, and are adaptable to most major crops and soil types, making them the primary choice for high-yield, modern agriculture.

**2. Government Investigation into Price-Fixing in the Fertilizer Industry**

107. Producers throughout the United States are confronted with difficult decisions regarding fertilizer purchases and financial viability.

108. On October 28, 2025, Mark Mueller, President of the Iowa Corn Growers Association (ICGA), addressed a U.S. Senate Committee Hearing concerning competition issue within the Seed & Fertilizer Industries.

109. Mueller:

a. attributed the escalation in fertilizer prices to two decades of unchecked consolidation within the U.S. fertilizer industry, which has resulted in only a few major companies dominating each market segment;

b. informed the committee that the substantial increase in fertilizer costs is severely impacting corn growers in Iowa, and similar challenges are being faced nationwide;

c. attributed the escalation in fertilizer prices to two decades of unchecked consolidation within the U.S. fertilizer industry, which has resulted in only a few major companies dominating each market segment;

d. asserted that such market concentration has led to fertilizer costs significantly exceeding the prices farmers obtain for their corn.

73. In December 2025, President Donald Trump issued an Executive Order instructing the U.S. Attorney General and the Chairman of the Federal Trade Commission to establish Food

Supply Chain Security Task Forces within their respective agencies to rigorously investigate price-fixing and anti-competitive practices across the food sector.

110. On January 21, 2026, Stephen Vaden, Deputy Secretary of the United States Department of Agriculture attributed elevated fertilizer prices to anticipative conduct, expressly stating:

> "Mosaic and Nutrien have a joint venture in Canada where they openly - their word "work together", my word "collude", to control prices up there. That would be such a clear violation of the antitrust laws of the United States. They don't bring that joint venture officially down here in the United States, but what they've been able to manage to do through other means is achieving the same result, constraining supply and driving up the price that farmers pay."

111. During the class period Mosaic and Nutrien participate in a joint venture in Canada where they collaborate to influence pricing that is implemented in the United States stream of commerce.

112. In essence, the Mosaic and Nutrien joint venture stands in Canada and fires their weapon at targets in the United States. Such a course of unfair and deceptive acts which complicates events within United States Antitrust laws is unlawful.

113. Mosaic and Nutrien have nonetheless constrained the supply in the United States and thus drove up the price of fertilizer in the United States.

114. In February of 2026, the ICGA and the Texas Corn Producers Association sent letters to U.S. Attorney General Bondi requesting information about what the U.S. Department of Justice ("DOJ") was doing to pursue possible antitrust actions against the fertilizer industry.

115. The letters explicitly detailed the farmers' concerns about decreasing crop yields, persistent high fertilizer prices, and their demand for government intervention.

116. On March 4, 2026, Bloomberg reported that the Department of Justice Antitrust Division initiated an investigation into several leading fertilizer producers—including CF Industries, Koch Inc., Mosaic, Nutrien, and Yara International—regarding potential collusion in

pricing practices affecting U.S. farmers. The inquiry is focused on determining whether coordinated pricing or supply decisions may have breached civil or criminal antitrust statutes.

**3. NPK Fertilizer Prices Increased Sharply and Stayed High Despite Lower Costs and Demand and Rose as a Result of the Defendant's Unlawful Anticompetitive Business Practices**

117. During the Class Period, NPK fertilizer prices experienced substantial increases attributed to the unlawful, unfair, deceptive, and anticompetitive conduct of the Defendants. In 2022, NPK fertilizer costs increased significantly. This affected the Plaintiff and all Class members. For example, a Texas A&M study published in January of 2022 found that the fifty percent (50%) increase in fertilizer costs added about $128,000 in expenses per U.S. farm. This affected the Plaintiff and all Class members.

118. The pricing trends deviated from pricing patterns observed prior to the Class Period, when price fluctuations were typically temporary and market dynamics restored equilibrium, reflecting a competitive environment.

119. NPK fertilizer prices rose sharply in 2021, breaking from historical trends, and stayed high through 2022. Farmers, analysts, companies, and others noted the persistent price increases. *See*, e.g https://www.agriculture.com/news/crops/skyrocketing-fertilizer-market-has-farmers-analysts-and-companies-weighing-in. *See also*, https://www.fas.usda.gov/data/impacts-and-repercussions-price-increases-global-fertilizer-market.

120. Between 2020 and 2021, the wholesale fertilizer index rose by more than 60%.

121. In 2022, wholesale fertilizer prices averaged 132% above their 2020 level, maintaining this upward trend

122. Thus far, in the long run, the price of fertilizer has experienced a consistent upward trend, rising by 37% from 2020 to 2025.

123. NPK market structure enabled the Defendants to easily coordinate artificial market

conditions for a simple and easily understood reason. Only a few major producers control essentially all of the NPK Fertilizer production in North America.

124. Beginning around 2021, the Defendants participated in a coordinated effort to restrict output and maintain capacity discipline. As a group, they limited the supply of NPK Fertilizers in the United States through several measures, including: (a) reducing production and available capacity; (b) delaying or limiting expansions of production despite historically high prices; (c) managing inventories to uphold artificial scarcity; and (d) refraining from significant increases in output in response to higher prices.

125. It is not in dispute that record-high prices in a competitive market led to increased supply.

126. During the class period and continuing the Defendants coordinated tandem efforts maintained "Capacity Discipline." Capacity Discipline simply means limiting supply despite extraordinarily high pricing.

127. It is not in dispute that the Defendants reported record profits during the years under review.

128. The fact that the continued rise in NPK fertilizer prices after 2021 cannot be justified by input costs is a class wide common question.

**4. Collusion**

129. Economic research shows that industry structure matters when evaluating potential antitrust violations.

130. Although collusion is possible in any sector, it is more likely in industries where conditions favor it, making indicators of collusion more significant in such cases.

131. **Concentration of supply side:** The Defendants are among the largest producers of NPK Fertilizers sold in the United States and together control over 80% of the North American

nitrogen fertilizer market and over 90% of the North American phosphate and potash markets. Because the manufacture of NPK Fertilizers is highly concentrated, with the Defendants controlling the vast majority of production, the NPK Fertilizer market is highly susceptible to collusion.

132. In addition to the extremely low and easily managed number of players that control the market, he NPK industry's structure transforms collusion among the Defendants to a contextually simplified and straightforward exercise.

133. **Standardization of the product:** Standardization of the product(s) in issue is another universally accepted evaluative factor in determining whether unlawful collusion likely led to market price increases.

134. NPK fertilizers are standardized, as their core nutrients are commodity chemicals used interchangeably from any source, which also helps firms coordinate pricing more easily.

135. **Opportunity to collude at trade association meetings**: Another universally accepted evaluative factor when determining the likelihood of collusion in an industry or industry sector is the opportunity to collude at trade association meetings.

136. Here the number of opportunities to collude at trade association meetings is worth noting:

a. Trade associations, such as the International Fertilizer Association (IFA), offer opportunities for collusion. All six Defendants are active IFA members, with several serving on its Board. IFA regularly hosts in-person events like the Annual Conference and Cultivating Tomorrow Conference, where Defendants interact;

b. David Bilby (CF Industries) and Shawn McGreevy (Koch Fertilizer LLC) currently serve as Board members of the Fertilizer Industry Round Table (“FIRT”), a fertilizer trade association. Gary Vogen (Yara North America, Inc.) previously held a

position as a Board member at FIRT. FIRT organizes an annual meeting in collaboration with The Fertilizer Institute ("TFI").

c. CF Industries, Koch Fertilizer, The Mosaic Company, Nutrien, and Yara North America are Board members of The Fertilizer Institute, a national industry group based in Arlington, Virginia;

d. TFI sponsors several trade events, such as the Annual Business Conference, Agronomy Conference and Expo, World Fertilizer Conference, and Market & Logistics Conference;

e. TFI offers exclusive market volatility resources to members and sponsors several industry events, including the Annual Business Conference, Agronomy Conference and Expo, World Fertilizer Conference, and Market & Logistics Conference.

f. Koch Agronomic Services, LLC and The Mosaic Company belong to the Arlington-based Agricultural Retail Association (ARA). Nathan Packer (Nutrien Ag Solutions) and Bob Ness (The Mosaic Company) are ARA Board members. ARA hosts regular in-person events, including its Annual Conference and semi-annual committee meetings.

g. All six Defendants are members of Fertilizer Canada (FC), an Ottawa-based organization representing producers and distributors of nitrogen, phosphate, potash, and sulfur fertilizers. CF Industries, Koch Fertilizer Canada, The Mosaic Company, Nutrien, and Yara North America serve on FC's Board;

h. Nutrien Ltd., The Mosaic Company, and Koch Sulfur Products Company L.L.C. are Board members of The Sulfur Institute (TSI), a global association for sulfur professionals in Washington, D.C. TSI holds annual trade events, including the Sulphur World Symposium and Executive Committee Meeting.

137. **Concentration of supply side:** It is obvious even to the most casual observer that collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories.

138. The Defendants are major producers of NPK fertilizers in the United States, controlling over 80% of the North American nitrogen market and more than 90% of the phosphate and potash markets. This remarkable concentration makes the NPK fertilizer market prone to collusion.

139. **High barriers to entry*:*** The manufacturing of NPK Fertilizers is characterized by substantial entry barriers. Entering the NPK Fertilizer industry requires substantial investment in production facilities and equipment, giving larger companies an advantage with multiple sites. Significant capital is needed for specialized machinery, making it difficult to compete with established manufacturers. Large-scale operations allow these companies to achieve economies of scale, creating high entry barriers that deter new competitors and increase the risk of market collusion. Moreover, heavy emphasis on research and development further discourages new entrants.

140. **Inelastic demand:** The demand for NPK Fertilizers is inelastic. Industries exhibiting inelastic demand, such as the NPK Fertilizers manufacturing sector, are particularly vulnerable to cartel establishment and activity compared to those with elastic demand.

141. The absence of substitute goods is indicative of inelastic demand. NPK Fertilizers are not readily substitutable with other products; while various fertilizers exist, NPK Fertilizers distinguish themselves by delivering precise and balanced nutrients, ensuring rapid soil uptake, and offering broad adaptability across crop types.

142. Each Defendant does not dispute that NPK customers do not regard NPK Fertilizers as interchangeable with alternative fertilizer options.

143. **Unconcentrated demand side*:*** Given the large number of buyers, each accounting for only a minor share of the overall market, the Defendants have no financial incentives, apart from price fixing litigation which is usually settled for pennies on the dollar, to deviate from collusive pricing agreements as individual transactions exert minimal influence. Conversely, breaches of collusive pricing agreements yield significant repercussions

144. Each Defendant does not dispute that:

a. the unconcentrated demand side of the NPK Fertilizers market is unconcentrated;

b. the unconcentrated demand side of the NPK Fertilizers market has insufficient buyer leverage to drive competitive behavior;

c. the insufficient buyer leverage on the unconcentrated demand side of the NPK Fertilizers market renders the NPK Fertilizer market vulnerable to collusion.

145. **History of antitrust violations:** Finally, The NPK Fertilizers industry has a history of antitrust scrutiny.

146. In 2008, U.S. purchasers filed antitrust lawsuits alleging that major producers—including companies such as Mosaic, PotashCorp, and Agrium—coordinated production and sales to keep potash prices artificially high. Plaintiffs' claims survived a motion to dismiss and were subsequently upheld by the Seventh Circuit in *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 860 (7th Cir. 2012).

147. Plaintiffs alleged producers shared market information, allocated volumes, and restricted output as part of a "tight-knit global cartel." Several companies later settled private antitrust claims, with settlements around $43.75 million each from firms such as Mosaic and PotashCorp (without admitting wrongdoing). Agrium, Inc. agreed to pay an additional $10 million, bringing the total settlement value to nearly $100 million.

148. The settlement did not end scrutiny of anticompetitive practices in the Potash industry. In 2013, the American Antitrust Institute found that a few global fertilizer producers likely coordinated to raise prices, harming competitors and consumers. The report also noted Potash producers, via Canpotex, shared export price and volume information in ways considered anticompetitive. Emboldened by greed, lack of enforcement, and confidence in the strategies referenced herein, the Defendants aggressively moved forward no later than 2021 to unlawfully and artificially raise NPK prices.

**5. Further Evidence Supporting the Fact The Defendants Conspired to Increase NPK Fertilizer Prices**

**a. Nitrogen**

149. The above facts are more than sufficient to sustain Plaintiff Click Farms causes of action and request to certify a class, but there are additional facts worth noting. For example, the sharp and otherwise inexplicable price increase in Nitrogen Fertilizer from 2021 to 2022 and again in 2024. The year 2025 through this date is still under review. Plaintiff reserves the right to supplement this class action complaint to conform to the evidence.

150. For ease of reference, the Nitrogen defendants are CF Industries, Koch, Nutrien, and Yara.

151. CF Industries' public statements reveal significant year-over-year growth in Nitrogen Fertilizer prices from 2021 to 2022. For example:

a. an 88% increase in ammonia prices (from approximately $452 per metric ton in 2021 to approximately $849 per metric ton in 2022);

b. a 45% increase in urea prices (from approximately $397 per metric ton to approximately $574 per metric ton);

c. a 93% increase in UAN prices (from approximately $247 per metric ton to approximately $477 per metric ton); and

d. a 78% price increase for ammonium nitrate (from approximately $269 per metric ton to approximately $480 per metric ton).

152. It is not in dispute that Defendants Yara and Koch made similar price increases across their Nitrogen Fertilizers.

**b. Phosphorus**

153. As referenced above, Nutrien and Mosaic's public financial disclosures show that phosphate fertilizer prices rose sharply in 2021, reaching record highs in 2022.

154. Additionally, Nutrien's North American phosphate fertilizer price increased by 34%, rising from $602 per ton in 2021 to $806 in 2022. Mosaic's price similarly rose by 43%, moving from $564 to $804 during the same period.

155. Recent corporate disclosures reveal that Phosphate Fertilizer prices have risen following a decline from their 2022 highs. Recent corporate disclosures indicate that Phosphate Fertilizer prices have increased following a decline from their peak in 2022. Nutrien announced a rise in its North American phosphate selling price from approximately $677 per metric tonne in the fourth quarter of 2024 to around $747 per metric tonne in the fourth quarter of 2025, reflecting an approximate 10% growth. Similarly, Mosaic reported a price increase of roughly 16% for the same period, with prices advancing from $593 per ton to about $686 per ton.

**c. Potash**

156. Public financial disclosures from Nutrien and Mosaic demonstrate a significant increase in potash prices beginning in 2021, reaching historically elevated levels in 2022.

157. According to Nutrien, the average net realized selling price for potash in North America rose from approximately $317 per metric ton in 2021 to around $667 per metric ton in 2022, representing an increase of roughly 110%.

158. Similarly, Mosaic's 2022 annual disclosures confirm that its average selling price

for potash grew from approximately $285 per ton in 2021 to about $632 per ton in 2022—an increase of approximately 122%.

159. More recent company reports indicate that potash prices rose again after a decline from their 2022 peaks. Nutrien disclosed that its North American potash selling prices climbed from nearly $270 per metric tonne in the fourth quarter of 2024 to about $305 per metric tonne in the fourth quarter of 2025, an increase of roughly 13%. Mosaic reported a comparable trend, with prices rising from approximately $199 per tonne to approximately $264 per tonne during the same timeframe, a growth of about 33%.

### 6. Defendants' Justifications for Price Increases Are Insufficient, Self-Serving and at Best Constitute Another Common Question of Fact Supporting Class Certification

160. Defendants attribute NPK Fertilizer price hikes to inflation, logistics disruptions, and global supply issues, citing the war in Ukraine and sanctions on Russia and Belarus.

161. However, these supply disruptions do not fully explain why prices stayed high for farmers.

162. After the 2022 Ukraine invasion, Potash producers outside sanctioned regions could have increased supply and lowered prices, but instead kept prices above 2021 levels—suggesting possible market manipulation.

163. In December 2025, US sanctions on Belarusian Potash were lifted, yet prices remained unchanged despite added supply.

164. Higher input costs cannot justify persistent Nitrogen Fertilizer price increases, as prices stayed high even when natural gas was cheap.

165. Overall, NPK Fertilizer prices stayed elevated during the Class Period, even as commodity markets softened.

166. In sum, the Defendants claimed a global shortage to justify record-high prices, yet their documents show unused capacity and limited production impacts. For example, Yara's public

reporting memorialized high natural gas prices have had little effect on fertilizer output. Nutrien halted ammonia production due to low prices but made clear it could ramp up if conditions improved. At the same time, both companies' potash capacity exceeded current output, with Nutrien's 2020 production cost at a record low of $59 per ton.

167. The Defendants rationale justifying the increases just doesn't add up.

## VI. ANTITRUST IMPACT AND DAMAGES TO THE PLAINTIFF AND THE CLASS

168. Throughout the Class Period, the Plaintiff and similarly situated class members made purchases of NPK Fertilizers from the Defendants.

169. Due to the Defendants' alleged anticompetitive conduct, Plaintiff and members of the Class incurred higher costs for NPK Fertilizers than they otherwise would have, resulting in antitrust injury and damages. The overcharges paid by Plaintiff and the Class for NPK Fertilizers constitute antitrust injury and harm to competition as defined under federal antitrust laws.

170. As a result of the Defendants' anticompetitive conduct Plaintiff and members of the Class have been deprived of the benefit of price competition

171. Due to the Defendants' anticompetitive practices, competition within the NPK Fertilizers market has been diminished or removed.

172. Due to the Defendants' anticompetitive practices, prices for NPK Fertilizers have been maintained at supracompetitive levels

173. As a result of the Defendants' anticompetitive conduct, prices for NPK fertilizers have remained at levels above those typically found in a competitive market.

## VII. CLASS ACTION ALLEGATIONS

174. Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

All individuals and entities within the United States and its territories who purchased NPK Fertilizers directly from any Defendant or their subsidiaries or affiliates during the period commencing no later than January 1, 2021 until the date of class certification in this matter are included in the Class. The following are excluded: Defendants, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, as well as the Court and its staff.

175. **Numerosity:** Plaintiff believes that the Class is too large for joinder at least in part due to Defendants' substantial and dominate nationwide presence and the universal use of NPK fertilizer by putative class members, although the exact number of members is unknown.

176. **Commonality:** There are shared legal and factual questions for all Class members due to Defendants' alleged anticompetitive actions affecting the entire Class. Relevant common questions include, but are not limited to:

(a) The facts set forth in each averment above as to each Defendant who lodges a denial;

(b) The definition of the relevant product market;

(c) The identity of the participants in the alleged conspiracy;

(d) The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

(e) Defendants' market power within the pertinent product market;

(f) Whether defendants exchanged competitively sensitive information;

(g) Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of NPK Fertilizers in the United States and its territories;

(h) Whether such conspiracies violated federal antitrust laws;

(i) The effect of the alleged conspiracy on the price of NPK Fertilizers during the Class Period;

(j) Whether the Defendants and their unnamed co-conspirators participated in a combination or conspiracy to fix, raise, maintain, or stabilize prices of Nitrogen Fertilizers;

(k) Whether the Defendants and their unnamed co-conspirators were involved in a combination or conspiracy to fix, raise, maintain, or stabilize prices of Phosphorus Fertilizers.

(l) Whether the Defendants and their unnamed co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize prices of Potash.

(m) The duration of the alleged conspiracies described herein and the specific actions taken by Defendants and their unnamed co-conspirators in furtherance of these conspiracies.

(n) Whether such conspiracies constituted violations of federal antitrust laws.

(o) Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

(p) Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;

(q) The effect of the alleged conspiracy on the price of NPK Fertilizers during the Class Period;

(r) Whether the Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

(s) The appropriate class-wide measure of damages;

(t) The nature of appropriate injunctive relief to restore competition in NPK Fertilizer market, or in each of the nitrogen, phosphorus, or potash markets respectively; and

(u) The appropriate class-wide measure of damages.

177. **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff and undersigned counsel will fairly and adequately protect the interests of the Class.

Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for fertilizer from Defendants.

178. **Adequacy:** Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

179. **Predominance:** The legal and factual questions shared among the Class members are predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

180. **Superiority:** Class action treatment is the most effective way to resolve this controversy, allowing many similar claims to be handled together efficiently and avoiding duplicated efforts and costs. Class mechanism benefits injured parties by enabling them to seek redress for claims impractical to pursue alone, outweighing potential management challenges. Separate lawsuits would risk inconsistent rulings and conflicting standards for Defendants.

181. **Injunctive Relief (Federal Rule of Civil Procedure 23(b)(2))**. Defendants have acted or refused to act on grounds generally applicable to Plaintiff and to all Class members, thereby making appropriate identical injunctive relief with respect to the Class as a whole.

## VIII. INTERSTATE TRADE AND COMMERCE

182. Defendants deliberately conspired to fix, maintain, stabilize, or inflate NPK Fertilizer prices, targeting interstate commerce within the U.S. and its territories

183. Defendants' conspiracy directly, substantially, and foreseeably impacted interstate commerce in these areas.

184. Each year, billions of dollars in NPK Fertilizer transactions occur across interstate commerce in the U.S. and its territories, with payments moving similarly.

185. Defendants' actions directly harmed competition; without this price-fixing conspiracy, NPK Fertilizer prices would have reflected a competitive market.

## IX. ANTICOMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKETS

186. The *per se* standard does not require defining a relevant product or geographic market if anticompetitive effects are clear. However, Plaintiff includes these definitions below in case a "quick look" or rule of reason analysis is applied.

187. The Defendants conspiratorial anticompetitive and unlawful acts, practices, strategies and conduct conspiracy had the following effects, among others:

(a) The Plaintiff and members of the class have not received the advantages typically provided by free and open competition among defendants.

(b) The Plaintiff and members of the class have been denied fair and open competition in the market for NPK fertilizers.

(c) Price competition for NPK fertilizers has been restricted or eliminated.

(d) The prices of NPK fertilizers have been unlawfully and artificially fixed, increased, maintained, or stabilized at artificially elevated levels.

(e) The Plaintiff and members of the class have not benefited from competitive market conditions in the purchase of NPK fertilizers

(f) The Plaintiff and members of the class have have paid prices that were artificially inflated for NPK fertilizers

188. The purpose of the conspiratorial and unlawful conduct of Defendants was to fix, raise, stabilize, and/or maintain the price of NPK Fertilizers.

189. The precise amount of the overcharge impacting the prices of NPK Fertilizers paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

190. By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for NPK Fertilizers than they would have paid in the absence of Defendants' illegal conduct, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**A. The Relevant Product Market Is the NPK Fertilizers**

191. The relevant product market, if required to be established, is identified as the market for NPK Fertilizers.

192. NPK Fertilizers have no reasonable substitutes, thus constituting a distinct product market. Furthermore, or alternatively, discrete submarkets may exist for Nitrogen Fertilizers, Phosphate Fertilizers, and Potash.

**B. Relevant Geographic Market: United States**

193. Self-delineation of the geographic market is necessary in this context, it should be defined as the United States and its territories.

194. Defendants manufacture and sell NPK Fertilizers nationwide and have raised prices across the United States and its territories.

**C. "Plus Factors" Offer Additional Evidence of Defendants' Conduct**

195. In addition to the facts set forth throughout, legal and economic scholars specializing in antitrust have delineated specific "plus factors" that signal collusive conduct. These "plus factors" represent economic actions and outcomes which, beyond parallel behaviour among oligopolistic firms, indicate coordinated activity rather than independent operation. Each "plus factor" functions as circumstantial evidence of active collusion, as opposed to mere conscious parallelism. The most persuasive elements, known as "super plus factors," offer stronger support

for the existence of explicit collusion.

196. Multiple compelling factors indicate that Defendants may be engaged in a *per se* unlawful price-fixing arrangement. These factors encompass: (a) the commodity nature of the product; (b) the exchange of competitively sensitive information; (c) opportunities and invitations for collusion; an increasingly concentrated market; (d) an increasingly concentrated market; (e) the substantial barriers to entry are not in dispute.

197. Potash are fungible and homogeneous commodity products with minimal differentiation. Consequently, one supplier's product can easily be substituted for another's. As a result, buyers tend to base their purchase decisions primarily, if not entirely, on price

198. The NPK Fertilizer industry has strong trade associations and networking events that enable collusion among Defendants. The Fertilizer Institute, the main U.S. fertilizer association, holds an annual conference for industry networking. In 2026, executives from Nutrien, Mosaic, CF Industries, Koch, and Yara serve on The Fertilizer Institute's Board of Directors. All Defendants also belong to the International Fertilizer Association ("IFA"), which hosts annual events and runs IFASTAT, a database offering global market statistics. Nutrien's Kenneth Seitz is part of IFA's Executive Committee.

199. The sharing of firm-specific, sensitive information demonstrates active collusion. Mosaic and Nutrien participate in Canpotex, a Canadian export-marketing agency enabling collective overseas sales of Potash. Through Canpotex, confidential production data, pricing details, and sales volumes are exchanged information typically safeguarded. Furthermore, there is significant personnel overlap, exemplified by Nutrien's CEO previously serving as President and CEO of Canpotex.

200. The NPK Fertilizer market is highly concentrated, with two firms dominating Potash and Phosphorus production, and four controlling Nitrogen output. Foreign Potash suppliers

have lost competitiveness due to the Ukraine conflict and U.S. tariffs. Industry consolidation since 2008 includes CF Industries acquiring Terra in 2010 and the merger creating Nutrien in 2018, now the world's second-largest Nitrogen Fertilizer producer.

201. A 2024 Texas A&M study found high Herfindahl-Hirschman Index scores for U.S. fertilizer markets: Potash (3,455), Nitrogen (2,382), and Phosphate (4,553). Scores above 1,800 signal high concentration per DOJ and FTC standards. Farmers report higher prices linked to this consolidation; the North Dakota Farmer's Union has criticized limited antitrust investigations despite evidence of both market concentration and anticompetitive pricing.

## X. CLAIMS

### Count I: Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) (Conspiracy in Restraint of Trade)

202. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

203. Beginning as early as January 1, 2021, the exact date being unknown, until the date on which any Class is certified, Defendants entered into and engaged in a contract, combination, or conspiracy with regard to fertilizer in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

204. The contract, combination, or conspiracy consisted of an agreement among the Defendants to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for NPK Fertilizers in the United States and its territories.

205. In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including the following:

(a) Exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, or maintain prices of NPK Fertilizers sold in the United States and its territories;

(b) Participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, raise, stabilize, or maintain prices of NPK Fertilizers, including surcharges on NPK Fertilizers sold in the United States and its territories; and

(c) Participating in meetings and conversations among themselves to implement, adhere to, and police the agreements they reached.

206. Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, stabilize, or maintain prices of fertilizer.

207. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for NPK Fertilizers has been restrained, suppressed, and/or eliminated;

(b) Prices for NPK Fertilizers provided by Defendants have been fixed, raised, stabilized, or maintained at artificially high, non-competitive levels throughout the United States and its territories; and

(c) Plaintiff and members of the Class who purchased NPK Fertilizers from Defendants have been deprived of the benefits of free and open competition.

208. Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for NPK Fertilizers purchased from Defendants and than they would have paid and will pay in the absence of the conspiracy.

209. The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

210. Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants to prevent and restrain the violations alleged herein.

## XI. REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff and the Class respectfully request the following relief:

a. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as representative of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

b. The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and that acts done in furtherance thereof by Defendants be adjudged to have been *per se* violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

c. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, and from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

d. That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

e. That each of the Defendants, and their respective successors, assigns, parent,

subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

f. That the Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XII. JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 7, 2026


BONSIGNORE TRIAL LAWYERS, PLLC

By: *_/s/ Robert J. Bonsignore_*
Robert J. Bonsignore, Esq. (MA BBO #547880)
Marsha C. Mason, Esq. (Of Counsel)
**Bonsignore Trial Lawyers, PLLC**
23 Forest St.
Medford, Massachusetts 02155
Mobile: (781) 354-1800
Office: (781) 350-0000
Facsimile: (702) 983-8673
Email: rbonsignore@classactions.us

Thomas Joseph Ellis, III
**Nolan Law Group**
20 North Clark Street
30th Floor
Chicago, IL 60602
Phone : (312) 630-4000
Fax: (312) 630-4011

***Counsel for Plaintiff***